### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **21-CR-448 (TJK)** |
| **GLENN BASS, JR.** | **:** | |

### DEFENDANT'S SENTENCING MEMORANDUM

On July 27, 2022, Mr. Glenn Bass, Jr. entered a guilty plea to influencing, impeding, or retaliating against a federal official by threat, in violation of 18 U.S.C. § 115(a)(1)(B), and unlawful possession of a firearm in a federal facility, in violation of 18 U.S.C. § 930(b). He will appear before this Honorable Court for sentencing on October 5, 2022. As set forth in the Presentence Investigation Report ("PSR"), the recommended sentencing range under the United States Sentencing Guidelines ("Guidelines") is 18 to 24 months incarceration. A sentence within that range, however, would be greater than necessary to serve the purposes of sentencing. For the following reasons, a sentence of time served would be sufficient but not greater than necessary to serve those purposes.

### Factual Background

Mr. Bass is a 32-year-old, single father of a teenage son and veteran of the United States Army National Guard, who holds a master's degree in criminal justice and has never before been convicted of or arrested for a criminal offense. He served in the National Guard for more than ten years and, as a result, has a service connected/related disability based on a traumatic brain disease, post-traumatic stress disorder (PTSD), and tinnitus. *See* Exhibit A. Despite these struggles, he has a long history of serving his country honorably, working hard to obtain an

education, maintaining employment, and supporting his son. His impaired mental health nonetheless led to the offense on June 22, 2021 and subsequent conviction in this matter. Since his arrest, he has continued to seek treatment and has been fortunate to have the support of his family, who have stood by him through the pendency of this case and are determined to help him receive the medical care he needs. *See* Exhibit H.[1]

Mr. Bass grew up primarily in Silver Spring, Maryland, where he lived with his parents and his sister. His father is a Deputy Program Director for the United States Food and Drug Administration. His mother is an occupational therapist. While in school, he played the violin, was a member of school orchestras, and participated in the Washington D.C. Youth Orchestra Program. He also participated in school and church choirs and on the wrestling and football teams.

During high school, at the age of 16, Mr. Bass became a father. He and his then-girlfriend had a son in 2006. The relationship with his girlfriend ended when his son was approximately a year old. At that time, his son lived primarily with his mother, who was raising his son with the help of her sisters, but Mr. Bass maintained contact with his son and helped to support him.

Mr. Bass also continued his school work and graduated from Paint Branch High School in 2008. Beginning in the summer after his high school graduation, he enrolled at the Citadel,

---

[1]Included in the attached letters from family, is a letter from Mr. Bass's father. Mr. Bass wants the Court to know that he believes his father, as reflected in the letter, wronging blames himself for not recognizing Mr. Bass's mental distress prior to the charged offense. Mr. Bass accepts full and sole responsibility for his own actions and deeply regrets the harm that he has cause, especially to his family, and he does not want his father to feel responsible in any way. Counsel nonetheless submits the letter to the Court to enable Mr. Bass Sr. to express himself as he wishes and to help the Court understand the connection between Mr. Bass's mental health and the charged offense.

The Military College of South Carolina. During the first semester of his freshman year, he joined the United States Army National Guard and went to basic training the following summer. In the fall of 2009, he began his second year at the Citadel, but soon decided to change schools.

He returned home, and began online courses at Everest University, where he earned an associate's degree. He later enrolled at Liberty University in Lynchburg, Virginia, taking courses online, while continuing to live with his parents. By 2011, he had earned a bachelor's and a master's degree in criminal justice.

While attending classes, he continued to serve in the National Guard. Beginning on October 10, 2008—with the exception of nine months between October 2015 and a reenlistment in July 2016—he served continuously until July 2019, including at least one period of overseas active duty in a designated imminent danger pay area (Egypt) from April 2011 to March 2012. *See* Exhibit B. He served in a number of positions including as an assistant machine-gunner, a grenadier, a rifleman, and in a military police unit. He also earned numerous awards, including:

> Armed Forces Reserve Medal with M device;
> Army Reserve Components Achievement Medal;
> Army Good Conduct Medal;
> National Defense Service Medal;
> Overseas Service Ribbon;
> Army Reserve Overseas Training Ribbon;
> Multinational Force and Observers Medal;
> Army Commendation Medal;
> Army Achievement Medal;
> Army Superior Unit Award;
> Maryland Military Department Emergency Service Ribbon;
> Maryland National Guard Outstanding Unit Ribbon;
> Global War on Terrorism Expeditionary Medal;
> Global War on Terrorism Service Medal; and
> Army Service Ribbon;

*Id.*

3

While he was serving in Egypt in 2011, during combat training, Mr. Bass's head hit a wall, and he lost consciousness. *See* Exhibit C. He was diagnosed with a concussion and a closed head wound. When he returned home in 2012, he was screened for Post Concussive Syndrome at the Ireland Traumatic Brain Injury Clinic, but he was not experiencing symptoms at that time.

He returned to Maryland to live with his parents and started taking online classes again, working toward another master's degree and his doctorate. Over the next several years, he also worked a number of part-time and full-time jobs, including a job as a security guard and a paid internship with the Federal Emergency Management Agency.

A few years after he returned from Egypt, in 2015, his son's mother called him and told him that she was sending their son to him and waiving her parental rights.[2] Mr. Bass welcomed his son, and they lived together at Mr. Bass's parents' home for the next several years. With the help of his parents, Mr. Bass worked hard to support his son and eventually obtained a job with the Department of Veterans Affairs police department.

On February 24, 2017, Mr. Bass completed the Department of Veterans Affairs Law Enforcement Training Center VA Basic Police Course in North Little Rock, Arkansas. *See* Exhibit D. He then was stationed at the Washington, D.C. Veterans Medical Center (DCVAMC) and worked there for several years, while continuing to serve in the National Guard.

While working at the DCVAMC, Mr. Bass bought a home in Silver Spring and moved there with his son in 2017. In 2019, Mr. Bass decided to rent the Silver Spring property and purchased another house in Waldorf, Maryland, where he moved with his son.

---

[2] Mr. Bass's family reports that his son's mother waived her parental rights because she believed it was best for him to live with Mr. Bass because she was seeing a man who was abusive toward their son.

The photos below depict Mr. Bass as his family knows him – a happy, supportive father, brother, and son.

  

Unfortunately, unbeknownst to his family and despite all his accomplishments, Mr. Bass struggled with his mental health. He sought help, and his doctors connected the concussive event that occurred while he was on active duty to his mental health issues. On July 25, 2018, a psychologist at the DCVAMC diagnosed Mr. Bass with a severe psychological disability. *See* Exhibit A.

In July 2019, because his mental health symptoms persisted, his doctor at the DCVAMC recommended that he have a scan of his brain by magnetic resonance imaging (MRI) to help further diagnose and treat his symptoms. *See* Exhibit E. Unfortunately, Mr. Bass did not follow up and his parents were not aware of the severity of his illness at that time, so the test was not performed.[3]

---

[3]As the Court may recall, Mr. Bass's father obtained an appointment for him to obtain the MRI in September 2022, but the government opposed Mr. Bass's request for temporary release to have the scan completed, and the Court did not rule on the motion. Mr. Bass, with his father's assistance, plans to reschedule the scan for the first available appointment after his release.

Although the MRI was not completed, Mr. Bass continued to attend counseling and psychiatric appointments, and while seeking that help, he continued to work. On July 13, 2019, he completed his last enlistment with the National Guard, and he was honorably discharged. *See* Exhibit B. Later that year, Mr. Bass left his position with the DCVAMC police to take a one year temporary position with the Department of Commerce that offered higher pay and the possibility of obtaining a permanent position. There, he worked as an international trade officer, analyzing claims of unfair trade practices. This temporary position expired in 2020.

During the course of the pandemic, Mr. Bass continued to suffer from anxiety, depression, and symptoms of PTSD, but he regularly attended his psychiatric appointments and complied with prescribed medication regimes. In April 2021, he met with his psychiatrist, who continued him on the same medications that were previously prescribed and directed him to return in three months.

In early 2021, Mr. Bass reapplied to and a short time later was rehired by the DCVAMC police, and in May 2021, he began working again as a trainee. Unfortunately, Mr. Bass continued to struggle with his mental health, which then led to poor performance at work, missed training sessions, and reprimands from his supervisor, Captain Bradford.

On June 22, 2021, in the face of reprimands from his supervisor, Mr. Bass lost control of his anxiety and PTSD symptoms. After an argument with his supervisor, Mr. Bass went to his car parked in the DCVAMC parking lot and made the following statements over his police radio:

> "V-45 to V-3. Let me tell you something. I was a US Army infantryman. And I'm a man. And I'm going to tell your bitch ass one last time. If I'm outside, I'm outside. But I got something for you at my car. Come see me. Security Forces."

"I know you heard me, V-3. V-45 is at his car. Come see me.
Security Forces. Let's go. Let's train."

"This is a personal meeting for V-3 and V-45. If anybody get in
my way, I've got my cell phone, I'm calling MPD. I'm about to
light it up at the DCVAMC. Let's go."

"Where is V-3 at? Where is V-3 at?"

At the time, Mr. Bass had his personal firearm with him at his car.[4]

As one police report noted, Mr. Bass did not have the firearm in his hand when the police
arrived, and he did not make any threatening movements. *See* Exhibit F. After officers arrived
near Mr. Bass's car, Mr. Bass said he wanted to speak to Captain Bradford. *Id.* After he was told
that Captain Bradford was responding, Mr. Bass "pulled the firearm out of his pants pocket,
turned counter clockwise and tossed it on the passenger seat of his vehicle." *Id.* His "actions in
removing the firearm from his pants were precise and intentional as to not show any form of
aggressive actions. The muzzle of his weapon was pointed toward the ground from the time he
removed the firearm from his pants to when he placed it on the back seat of his vehicle." *Id.* He
then surrendered to his fellow officers and was arrested.

Mr. Bass was brought before the Court for his initial appearance on June 24, 2021, and
the court ordered him held without bond. Following a detention hearing, on June 30, 2021, the
court released Mr. Bass to home detention. He remained on home detention for more than a year.
During this time he was ordered to and did participate in mental health treatment.

---

[4]He had lawfully purchased the firearm four years earlier in Maryland.

As set forth in the PSR, and as the Court may recall, there were a few issues of reported non-compliance, but these were not willful violations, nor did these violations create any danger to anyone; instead, these violations are attributable to Mr. Bass's mental health problems. *See* ¶¶ 8-10, 12. On October 29, 2021, Mr. Bass left his home temporarily without permission, and he was admonished by Pretrial Services to remain in his home and not step outside, and he later missed an appointment for a mental health assessment at the Insight Treatment Center on March 1, 2022. He reported that he did not remember the appointment, which was then rescheduled.

With reminders from counsel and Pretrial Services, Mr. Bass reported for the appointment on April 15, 2022. Mr. Bass intended to follow through on this appointment; however, he became confused during the process of checking in for the appointment, and he experienced a severe panic attack. His coping mechanism at the time was to drive directly toward his grandmother's house in South Carolina. On the way, he ran out of gas and walked the remainder of the distance—more than 10 miles—to her home. Mr. Bass's grandmother's home represents safety and comfort to Mr. Bass. When he was between the ages of seven and twelve, his family lived in South Carolina, near his grandmother. He spent a lot of time at her home with extended family. His parent speculate that Mr. Bass went to his grandmother's home on April 15, because that was where Mr. Bass feels safest. His grandmother, who is a retired nurse, reports that when he arrived, Mr. Bass seemed confused and exhausted. Mr. Bass's father then drove to South Carolina and took his son to the Department of Veterans Affairs Medical Center in Charleston. After a doctor there confirmed that Mr. Bass was not a danger to himself or others, Mr. Bass, Sr. drove his son home and subsequently brought him back before the Court.

8

Following this incident, the Court expanded the responsibilities of Mr. Bass's father as a third-party custodian, directing that Mr. Bass could not leave his home except in the company of his father for appointments approved by Pretrial Services. After the Court imposed this requirement, Pretrial Services reported two additional incidents. The first report was due to Mr. Bass leaving his residence on June 13, 2022. Mr. Bass, Sr. reports that prior to that date, he requested permission for Mr. Bass to go to his son's school that morning to complete the process for his son to transfer schools, as the school officials required. Mr. Bass, Sr. thought he had permission to take his son to the school. Mr. Bass followed his father's instructions, and he went with him, unaware that he did not have permission and was violating the conditions of his release.

On June 16, 2022, Mr. Bass, with the assistance of his father, sold his home in Waldorf. Mr. Bass and his son then moved in with Mr. Bass's parents in Silver Spring—this was why Mr. Bass needed to sign the paperwork for his son to transfer schools.

In June 2022, after he moved to his parents' home, the Pretrial Services Agency referred Mr. Bass to a new mental health service provider, Counseling Plus, Inc. The intake assessment confirmed that Mr. Bass's symptoms are consistent with PTSD, and the clinician recommended weekly counseling, which Mr. Bass attended as required.[5] The clinician also recommended a psychiatric evaluation and an MRI, as was previously recommended by the Department of

---

[5] In a reported dated July 22, 2022, Pretrial Services Agency also reported that Mr. Bass missed a counseling appointment on July 12, 2022. However, that was the date of Mr. Bass's first counseling appointment with the new provider, and the appointment had not been communicated to Mr. Bass or his father, who upon learning of the missed appointment, took Mr. Bass to the new provider the following day.

Veterans Affairs doctor. The recommended psychiatric evaluation took place on July 11, 2022

and confirmed the diagnosis of an anxiety disorder, with a further diagnosis deferred. *See* Exhibit

G at 5. Testing for anxiety revealed severe anxiety. *Id*. Testing for depression revealed moderate

depression, and the PTSD screening was positive. *Id*. The doctor who performed that evaluation

did not note memory problems, but Mr. Bass's family has observed memory issues over recent

years. Undersigned counsel also has observed that Mr. Bass has significant memory lapses.[6]

While on pretrial release, although he was attending counseling sessions, Mr. Bass

continued to experience severe anxiety and depression. As reported by Pretrial Services, on July

14, 2022, after his father had gone to sleep, Mr. Bass left his residence, and he walked for a little

more than two hours. This was simply an effort to relieve stress—his father notes that Mr. Bass

frequently walks to avoid stress. Pretrial Services reported that GPS monitoring showed that

Mr. Bass walked to a nearby car dealership and then walked back home. Mr. Bass does not recall

walking away from his house that evening.

Although that event and his trip to his grandmother's residence are notable exceptions,

Mr. Bass has complied with the stringent conditions of pretrial release for 13 months. He

willingly and actively participated in counseling. He appeared in court as required—both

virtually and in person. He followed the directions of his father, the third-party custodian. He did

---

[6] Specifically, Mr. Bass was not able to reliably report his education, work, or family history to
the Probation Officer for preparation of the PSR. For example, Mr. Bass recalled that he lived in
Detroit, Michigan and Ohio, but his parent report that he has never lived in those states.
Although his father worked in Detroit, Michigan for several years and traveled between there
and their family home, Mr. Bass did not live there and only visited his father in Michigan on one
occasion.

not incur any new arrests for any type of criminal conduct or place anyone in danger as a result of any of his behavior.

On July 27, 2022, delayed only by his counsel's inability to timely review his case—due largely to the change in counsel and workload—and adequately advise him and ensure that he was competent to move forward, Mr. Bass accepted responsibility for the charged conduct. He appeared before the Court and entered a guilty plea to threatening to harm Captain Bradford and unlawfully possessing a firearm on a federal facility. The Court ordered Mr. Bass to self-surrender on August 3, 2022, and he complied. He has been held at the Northern Neck Regional Jail since that date.

## Argument

When imposing a sentence, the Court must consider several factors, including the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct; and the United States Sentencing Guidelines. *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005). Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

*See* 18 U.S.C. § 3582 (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

11

I.        **The United States Sentencing Guidelines**

When sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall*, 552 U.S. at 50. Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

When considering the Guidelines in this case, the Court should consider that Mr. Bass's offense level was adjusted upward by six level for "conduct evidencing an intent to carry out such threat," pursuant to U.S.S.G. § 2A6.1(b)(1). As part of the plea agreement, Mr. Bass agreed that this adjustment applies because it applies whenever some conduct can be interpreted as evidence of intent to carry out a threat, and does not require actual intent to carry out the threat. *See United States v. Berndt*, 127 F.3d 251 (2d Cir. 1997) ("[T]he applicability of the

enhancement does not depend on the defendant's actual intent, which could exist regardless of whether any actions were taken toward carrying it out; rather it depends on whether or not the defendant engaged in conduct from which the court permissibly infers such an intent.").

Mr. Bass, however, in fact did not intend to carry out the threat as evidenced by his immediate surrender to fellow police officers within minutes of making the threat, as soon as the other officers approached him near his car, and as evidenced by the manner in which he carefully discarded the firearm when the officers approached. *See* Exhibit E. Given this conduct, increasing Mr. Bass's sentence from a range of 6 to 12 months (base offense level 12, minus 2 for acceptance of responsibility, for a total offense level 10 in Zone B), to a range of 18 to 24 months in Zone D, over-emphasizes the inference of intent and the nature of the threat.

The Court should also consider Mr. Bass's mental health. Consistent with the plea agreement, Mr. Bass is not requesting a departure due to Mr. Bass's mental and emotional condition pursuant to U.S.S.G. § 5H1.3, or a diminished capacity departure pursuant to U.S.S.G. § 5K2.13. However, for the same reasons that a downward departure is warranted when mental and emotion conditions distinguish a case from the typical cases covered by the guideline (U.S.S.G. § 5H1.3) or when a significantly reduced mental capacity contributes substantially to the commission of the offense (U.S.S.G. § 5K2.13), a variance would be appropriate based on these circumstances. Mr. Bass's education, employment, military, and family background demonstrate that the offense conduct was an aberration. His service-related disability complicated by anxiety and depression significantly contributed to the offense and warrant a variance.

## II.      The Nature and Circumstances of the Offense

Without question, making threats against a federal officer and unlawfully possessing a firearm on a federal facility are serious offenses, but this incident was is not indicative of Mr. Bass's character. He has spent many years studying criminal justice, serving his country, and serving in the Department of Veterans Affairs police department. While his emotions temporarily were out of control on June 22, 2021, leading him to make threatening statements that he sincerely regrets, his reaction to the police response demonstrates his true respect for the law.

## III.      History and Characteristics of Mr. Bass

As described in greater detail above, Mr. Bass has distinguished himself in his service to his country, his pursuit of an education, his employment history, and his support of his son. He would not be before the Court except for his mental health disability. Significantly, he has long recognized and sought treatment. He also is fortunate to have the continuing support of his family. When he is released, he will continue to seek treatment—including an MRI to fully understand his disability and ensure he has the appropriate treatment—and his family will support these efforts.

## IV.      The Purposes of Sentencing

No additional term of incarceration is necessary to serve the purposes of sentencing. Prior to entering his guilty plea, Mr. Bass served 13 months on home detention—a significant punishment in itself—and as of the date of sentencing, will have been incarcerated for more than two months. He has no prior criminal offenses, and he never before has experienced incarceration. These two months have been impactful and sufficient to adequately deter Mr.

14

Bass. The combination of this period of detention, home detention, and supervised release also is sufficient to act as general deterrence given the unique circumstances of this case.

Additional incarceration is not necessary to reflect the seriousness of the offense or promote respect for the law. Mr. Bass's conduct was a flagrant violation of the law, but rather based in his mental health disability—a temporary lapse, rather than a demonstration of disrespect for the law. Moreover the Court can impose punishment without incarceration by substituting conditions of supervised release, including home confinement and community service. A sentence of probation or supervised release itself is a "'substantial restriction of freedom.'" *Gall*, 128 S.Ct. at 595 (citation omitted). As the Supreme Court has explained:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Id*. at 595-96 (footnote omitted). By structuring a sentence that does not involve additional incarceration, the Court can both serve the purposes of sentencing and ensure Mr. Bass receives the medical attention he needs to resume his law-abiding, productive life.

## **Conclusion**

For the foregoing reasons and such other reasons as may be presented at the sentencing hearing, Mr. Bass respectfully requests that the Court impose a sentence of time served, substituting additional home confinement and/or community service for any additional term of incarceration.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____
MARY MANNING PETRAS
Assistant Federal Public Defenders
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500 ext. 109