## United States District Court
## For The District of Columbia

| | |
|---|---|
| **United States of America,** | |
| v. | Case No. 21-cr-448 (TJK) |
| **Glenn Bass Jr.,** | |
| Defendant. | |

### Emergency Motion for Reduction of Sentence
### Pursuant to 18 U.S.C. § 3582(c)(1)(A)

## I.  Introduction

Mr. Glenn Bass Jr., through undersigned counsel, respectfully moves on an emergency basis for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) because of his profoundly concerning psychological health.  Since entering the custody of the Federal Bureau of Prisons (BOP), Mr. Bass "has exhibited worrying memory loss, extended periods of confusion, an extremely muted range of emotional expression, difficulty communicating, a market lack of responsiveness to others, social withdrawal, catatonia, progressive immobility, and impaired ability to eat and drink." Ex. 1, Medical Declaration of Dr. Stephanie Davidoff at 2 (Dr. Davidoff Decl.).  A 32-year-old army veteran with a Master's Degree in Criminal Justice, who previously worked at both the Department of Commerce and Veterans Administration Police Department, Mr. Bass has been "reduced to living in a withdrawn, minimally interactive state, with the inability to perform the basic activities of daily living (i.e., hygiene, dressing, grooming) without assistance." *Id.* at 5.

1

Mr. Bass has now been diagnosed with schizophrenia, posttraumatic stress disorder (PTSD), catatonia, and Vitamin B-12 and folate deficiencies. *Id.* at 2-4. There is worrying evidence that he suffers from two other serious conditions: chronic traumatic encephalopathy (CTE) and a seizure disorder. *Id.* at 3-4. Mr. Bass has not even been inside a BOP facility for the majority of his imprisonment: because of his profoundly worrying symptoms, he was first transferred to a hospital in Hamilton, New Jersey, and then to a nursing home in Trenton, New Jersey, with two correctional officers as his only companions. His attorneys have been unable to speak with him; his parents have been unable to speak to him. He is now, finally, at a federal medical center, but his condition remains unchanged.

Mr. Bass has less than six months remaining on his sentence. He should not be forced to spend the following six months as he has the last four—in deep mental distress and alone. An independent psychiatrist who reviewed Mr. Bass's symptoms and diagnoses "do[es] not believe that either the prison system or a nursing home can provide the psychiatric care Mr. Bass requires." Dr. Davidoff Decl. at 5. Mr. Bass respectfully and urgently asks this Court to order his immediate release so that his family can get him the care he so desperately needs.

## II. Background

On June 23, 2021, Mr. Bass was charged by criminal complaint for making threats to a Captain for the U.S. Department of Veterans Affairs Police Department (VAPD) and possessing an unlicensed firearm at the D.C. Veterans Affairs Medical Center Campus (DCVAMC), where Mr. Bass worked as a trainee with the VAPD. *See* Compl., ECF No. 1 (Jun. 23, 2021). Mr. Bass was then charged by indictment on July 1, 2021, with 18 U.S.C. § 115(a)(1)(B) (Count One), 18

U.S.C. § 930(a) (Count Two), 18 U.S.C. § 930(b) (Count Three), and 22 D.C. Code § 4504(a) (Count Four). *See* Indict., ECF No. 6 (Jul. 1, 2021).

On July 27, 2022, Mr. Bass pleaded guilty to Counts One and Three of the Indictment pursuant to a plea agreement between the parties. *See* Plea Ag't, ECF No. 27 at 1 (Jul. 27, 2022). The parties estimated a Guidelines range of 18 to 24 months of imprisonment. *Id.* at 4.

On September 18, 2022, Mr. Bass moved for temporary release to attend a medical appointment. *See* Mot., ECF No. 32 (Sep. 18, 2022). In support of the motion, Mr. Bass explained that he was a veteran of the United States Army Reserves who suffered from post-traumatic stress disorder, and, according to his parents, memory loss. *Id.* ¶3. His father had only just learned that, in 2019, a doctor at the VAMC had recommended that Mr. Bass have an MRI to further diagnose mental health symptoms he had been experiencing, but the MRI was never performed. *Id.* ¶4. The motion was so that Mr. Bass could attend a scheduled MRI at DCVAMC. *Id.* The government opposed, *see* Mem. in Opp., ECF No. 33 (Sep. 20, 2022), and the Court did not rule on the motion prior to sentencing.

Mr. Bass's presentence report (PSR) noted that, during the probation officer's telephone interview with Mr. Bass, "he was unable to recall information and his speech was slurred." PSR ¶43. Mr. Bass's defense attorney and father reinforced that he suffered from "memory loss," and also noted his diagnoses of post-traumatic stress disorder and anxiety related to his military service. *Id.* ¶43, ¶¶54-55. His father related that Mr. Bass had "briefly alluded to [] an occasion where he had to remove human remains from an area and on a separate occasion the defendant experienced the detonation of an explosive device which injured the defendant and his unit members." *Id.* ¶55.

3

Mr. Bass's sentencing memorandum elaborated on his impaired psychological health. While serving in Egypt in 2011 during Operation Enduring Freedom, Mr. Bass's head hit a wall, and he lost consciousness. *See* Def. Sent'g Mem. at Ex. C, ECF No. 37 (Sep. 28, 2022). He was diagnosed with a concussion and a closed head wound. *Id.* In July 2018, a psychologist at the DCVAMC classified Mr. Bass as suffering from "a severe psychological disability." *Id.*, Exhibit A at 1. In July 2021, a VA psychologist had ordered an outpatient mental health consult, listing as his disabilities "traumatic brain disease," "post-traumatic stress disorder," and "tinnitus." *Id.*, Ex. A at 2. A July 2022 psychiatric evaluation ordered by the U.S. Probation Office indicated severe anxiety (24 on the HAM-A test), moderate depression (22 on the BID test), and PTSD. *Id.*, Ex. G.

On October 5, 2022, this Court sentenced Mr. Bass to 15 months of incarceration on both counts, to run concurrently, and 36 months of supervised release. *See* Min. Entry (Oct. 5, 2022); Judgment, ECF No. 43 (Oct. 19, 2022) at 3, 4. At the sentencing hearing, Mr. Bass's defense attorney noticed dried blood on his shirt and kufi. *See* Mot. for RRC Recommendation, Ex. 41 at ¶3 (Oct. 7, 2022). She asked him what had happened and he could not recall. *Id.* When he removed his kufi, counsel saw a large wound in his head closed by nine metal stitches. *Id.* Medical records from Northern Neck Regional Jail indicated that he had had a seizure and hit his head on October 2, 2022. *Id.* ¶4. With no objection from the government, Mr. Bass requested that this Court recommend residential reentry center placement for the remainder of his sentence. *Id.* ¶8; Resp., ECF No. 42 (Oct. 17, 2022). In Mr. Bass's written judgment, this Court recommended that Mr. Bass "be housed at Petersburg FCC or Cumberland FCI" and that he

4

"be evaluated for any necessary medical care and, if necessary to facilitate that care, be placed in a Bureau of Prisons medical facility or Residential Reentry Center." Judgment at 3.

As of February 14, 2023, Mr. Bass had completed 6 months and 23 days of his 15-month sentence. *See* Ex. 3, BOP Records at 3 (Sentence Computation as of 02-14-2023). His release date is August 16, 2023, with a home confinement date on July 3, 2023. *Id.* at 2-3.

### III.     Legal Principles

This Court has the authority to order Mr. Bass's early release under 18 U.S.C. § 3582(c)(1)(A)(i). This statute, first enacted as part of the Crime Control Act of 1984, granted district courts authority to reduce a defendant's term of imprisonment where there were "extraordinary and compelling reasons" warranting such reduction. However, as originally enacted, the statute only gave the court authority to grant compassionate release upon a motion by the Director of the BOP. *See* 18 U.S.C. § 3582(c)(1)(A)(i). "The BOP rarely did so." *United States v. Rodriguez*, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020).

In response, on December 21, 2018, Congress enacted the First Step Act, a law aimed at "unwind[ing] decades of mass incarceration." *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019); *see also* First Step Act, Pub. L. 115-391, § 603, 132 Stat. 5194 (2018). Of the First Step Act's many reform-oriented provisions, one stood out: "Increasing the Use and Transparency of Compassionate Release." First Step Act § 603. This provision took away BOP's exclusive authority to file compassionate release motions, allowing individuals to file motions directly with the sentencing court. *See* § 3582(c)(1)(A).

Now, when an individual files a compassionate release motion, a court may reduce a sentence if three prongs are met:

1. The individual has "fully exhausted his administrative remedies" or "there has been a lapse of thirty days from the warden's receipt of the defendant's request, whichever is earlier";

2. "extraordinary and compelling reasons warrant" a sentence reduction; and

3. the reduction is consistent with the § 3553(a) sentencing factors.

*See* § 3582(c)(1)(A)(i); *United States v. Johnson*, 464 F. Supp. 3d 22, 30 n.3 (D.D.C. May 16, 2020) (setting forth the three relevant factors in the compassionate release analysis); *United States v. Long*, 997 F.3d 342, 360-61 (D.C. Cir. May 18, 2021) (same).

As discussed below, Mr. Bass meets each of these requirements.

IV. **Argument**

A. **Mr. Bass Has Exhausted His Administrative Remedies.**

On January 11, 2023, Mr. Bass, through his attorney, requested early release from the BOP, highlighting his profound mental health symptoms. *See* Ex. 4, BOP Admin. Requests at 1 (Jan. 11, 2023 BOP Request). Then on January 19, 2023, Mr. Bass filed a second request through counsel, highlighting his head injury during combat training, raising a concern that the type of MRI provided to Mr. Bass was inadequate to his needs, and underscoring an issue identified in his EEG. *See id.* at 2 (Jan. 19, 2023 BOP Request). Thus, over 30 days have lapsed "from the receipt of such request by the warden of the defendant's facility," making his motion properly before this Court. *See* § 3582(c)(1)(A)(i).

B. **Mr. Bass's Deteriorating Psychological State Is an Extraordinary and Compelling Reason for His Early Release.**

Section 3582(c)(1)(A) allows for consideration of "post-sentencing changes to a prisoner's individual situation." *United States v. Jenkins*, 50 F.4th 1185, 1203 (D.C. Cir. 2022). "Typically, such reasons involve personal considerations such as the inmate's health, age, or

6

family circumstances." *Id.* at 1191; *see also* U.S.S.G. § 1B1.10 n.1.  In addition, courts may consider "other kinds of sympathetic personal circumstances" and other "individualized factors," such as a defendant's "'post-sentencing conduct and rehabilitation[.]'" *Id.* at 1200 (quoting *United States v. McCoy*, 981 F.3d 271, 288 (4th Cir. 2020)), 1207.

Since entering BOP custody in November 2022, Mr. Bass "has exhibited worrying memory loss, extended periods of confusion, an extremely muted range of emotional expression, difficulty communicating, a market lack of responsiveness to others, social withdrawal, catatonia, progressive immobility, and impaired ability to eat and drink." Dr. Davidoff Decl. at 2.  Mr. Bass's symptoms have persisted through relocations to six facilities in four months: from Northern Neck Regional Jail in Virginia, to FDC Philadelphia, to FCI Fort Dix, to the Robert Wood Johnson University Hospital in Hamilton, New Jersey, to the Riverside Nursing Home in Trenton, New Jersey, and finally to the Devens Federal Medical Center in Devens, Massachusetts.  The sheer number of relocations have undoubtedly been difficult for an individual in as much psychological distress as Mr. Bass.

Mr. Bass's mother relates that on November 18, 2022, his parents waited on a videocall with their son, but he never came.  *See* Ex. 5, Felicia Bass Letter to the Court (Feb. 17, 2023). Instead "two other inmates came on the camera to tell us that they had done everything they could to get him to come to the camera but he was nonresponsive.  They told us that he was not washing, eating, or taking medications." *Id.*  His parents have had no contact with their son since.  Neither have his attorneys.  Mr. Bass has either been outside a BOP facility and thus unable to utilize the normal means of communication available there (legal calls, Corrlinks, in-

7

person visits, use of prison pay phones), or in too much psychological distress to use any of those means of communication.

After sentencing and while at FDC Philadelphia, Mr. Bass was "observed wandering around the unit, mumbling to himself, appear[ing] quite confused and disoriented," and "made no eye contact and was unresponsive." *See* Ex. 2, Medical Records (Filed under Seal) at 145 (Nov. 29, 2022 Clinical Contact). Upon transfer to FCI Fort Dix, he was "found wandering on the compound," "unable to tell [a doctor] what unit he is supposed to be in and what year it is or what state he currently is in." *Id.* at 100 (Dec. 7, 2022 Clinical Encounter). Mr. Bass has been unable to "relate the day" or "where he is[.]" *Id.* at 40 (Inmate Intra-system Transfer). When asked to draw a picture of a clock and mark the time 7, he "put the position of 5 marking it as 7 with a circle around it" and "could not draw the minutes hand." *Id.* at 197 (Dec. 8, 2022 Dr. Wijaya Consult Note).

Mr. Bass did not seem to know his own mother's name, or to react when a psychiatrist told him that his family loved him. *See* Ex. 5, Felicia Bass Letter to the Court. He "covers his head and sits in the darkness," *id.*; he has been found "wrapped in a blanket with just his mouth showing" or "with a blanket wrapped around his head with only his eyes showing" or with a "towel covering his eyes [like a] bandana"; and he has been observed "sitting upright beside his bed, and staring at the wall." *See* Ex. 2, Medical Records at 141 (Dec. 1, 2022 Clinical Contact); 143 (Nov. 30, 2022 Clinical Contact); 77 (Dec. 21, 2022 Clinical Encounter); 9 (Feb. 9, 2023 Clinical Encounter). He does not or cannot answer questions, and when he speaks, his speech is "extremely low in volume" and has a "flat affect." *Id.* at 18 (Feb. 7, 2023 Clinical Encounter – Admin. Note). He is "catatonic," "withdrawn," and "silent." *Id.* at 100 (Dec. 7, 2022 Clinical

8

Encounter); *id.* at 76 (Dec. 23, 2022 Clinical Encounter – Admin. Note); 10 (Feb. 9, 2022 Clinical Encounter).  A recent health screen described his level of consciousness as "inattentive," his psychomotor activity as "slowed"; his mood as "flat"; and his thought content as "abnormal."  *Id.* at 22 (Feb. 8, 2023 Health Screen).

These are deeply troubling symptoms for an individual with two serious head injuries, the first in combat training in Egypt in 2011 and the second right before sentencing in October 2022. Mr. Bass has now been diagnosed with schizophrenia, posttraumatic stress disorder (PTSD), catatonia, and Vitamin B-12 and folate deficiencies.  *See* Dr. Davidoff Decl. at 2-4.  There is significant evidence that he also suffers from chronic traumatic encephalopathy (CTE) and a seizure disorder.  *Id.* at 3-4.

**Schizophrenia:** While at the Robert Wood Johnson Hospital, Mr. Bass was diagnosed with "Deficit Schizophrenia . . . with prominent negative symptoms and marginal daily functioning."  *Id.* at 75 (Jan. 4, 2023 Clinical Encounter – Admin. Note).  Dr. Davidoff explains that Mr. Bass suffers from the so-called "negative" symptoms of schizophrenia, "*i.e.* lack of emotional expression, apathy, social withdrawal, inhibited ability to communicate, and impoverished content of speech."  Dr. Davidoff Decl. at 2.  He does not suffer from the so-called "positive" symptoms that many associate with schizophrenia, *i.e.*, hallucinations and delusions. *Id.*  Mr. Bass's symptoms also include periods of confusion, catatonia (further discussed below), and memory issues.  *Id.*  Dr. Davidoff underscores that "[n]umerous clinical studies have shown that individuals with untreated, or inadequately treated, schizophrenia have a poorer prognosis with respect to general level of function, risk of relapse, and worsening of cognition when compared with those who are treated appropriately in a timely manner."  *Id.*

9

**Posttraumatic Stress Disorder:** Multiple medical professionals have diagnosed Mr. Bass with PTSD, presumed to have been caused by the explosion during his combat training with the National Guard. *Id.* PTSD is marked by "persistent anxiety and thoughts about the pivotal events, nightmares, and flashbacks of the event." *Id.* at 2-3. Dr. Davidoff explains that the "standard of care for treating individuals with PTSD, such as Mr. Bass, is to provide them with a stable and supportive environment, therapy with a qualified mental health clinician, and also, sometimes, psychiatric medication to reduce anxiety." *Id.* at 3.

**Catatonia:** Mr. Bass has now been diagnosed with a potentially life-threatening condition called catatonia. *Id.* This serious condition can cause "immobility, mutism, and behavioral abnormalities and is associated with mood disorders, schizophrenia, and some medical and neurological conditions." *Id.* Mr. Bass's symptoms include "non-responsiveness, progressive immobility, and impaired ability to eat and drink." *Id.* Dr. Davidoff notes that Mr. Bass appeared to respond to psychiatric medication but was inconsistent in taking it. *Id.* This is not abnormal for someone with this serious condition. Rather "[i]ndividuals with this condition must be closely monitored for worsening symptoms and medication compliance." *Id.*

**Possible Chronic Traumatic Encephalopathy:** Dr. Davidoff indicates that Mr. Bass may possibly suffer from CTE, noting his history of at least two serious head injuries. *Id.* She underscores that because of his "difficulty communicating, memory issues, and periods of confusion, it is not clear that the medical personnel assessing his condition are aware of these head injuries." *Id.* Notably, while a CTE diagnosis can only be made by autopsy, Mr. Bass appears to meet all the necessary clinical criteria: "cognitive impairment, memory loss, confusion, behavioral changes, and social withdrawal." *Id.* Dr. Davidoff finds "noteworthy that

symptoms of CTE don't usually appear for at least 8-10 years after the causal head injury, a timeline [with Mr. Bass's 2011 head injury during combat training] which corresponds with [his] worsening mental health and cognitive symptoms." *Id.*

Dr. Davidoff notes that Mr. Bass was given a head CT and brain MRI, which showed no acute signs of a stroke or bleeding. *Id.* However, she notes that the MRI was not done with contrast, "a more sensitive study for the revelation of some types of brain abnormalities." *Id.* In addition, a small vascular abnormality was detected, "consistent with the presence of a possible aneurysm." *Id.* Dr. Davidoff recommends additional consultation with a neurologist about obtaining additional brain imaging studies given this abnormality, as well as "neuropsychiatric testing to better clarify the nature of his cognitive deficits and to establish a baseline for future comparison." *Id.* at 4.

"There is currently no cure for CTE." *Id.* Rather, the standard of care is "to provide a supportive environment, treat any associated mental health issues (e.g., depression) and provide cognitive stimulation," which "can improve an individual's quality of life and may also attenuate the rate of cognitive decline." *Id.*

**Possible Seizure Disorder:** Dr. Davidoff indicates that Mr. Bass may also have an untreated seizure disorder. "His symptoms of intermittent memory loss, non-responsiveness and confusion could all be caused by seizures." *Id.* Notably, while he had a single EEG while hospitalized that was read as normal, Dr. Davidoff underscores that "clinical studies have shown that more than 50% of seizure disorders will not be detected by a single standard EEG." *Id.* Instead, "a neurologist should be consulted again about the advisability of obtaining additional testing to rule out the possibility that he has an untreated seizure disorder." *Id.*

**Vitamin B-12 & Folate Deficiencies:** Mr. Bass has been suffering from Vitamin B-12 and folate deficiencies, and anemia. Dr. Davidoff explains that either Vitamin B-12 or folate deficiencies can cause megaloblastic anemia, which is "abnormally large, poorly functioning red blood cells and a lower-than-normal red cell count." *Id.* "Such deficiencies may also cause cognitive deterioration, psychiatric symptoms (e.g. depression and psychosis), and other medical and neurologic problems." *Id.* Dr. Davidoff notes that although Mr. Bass was received supplementation while in custody, it is not clear that repeat bloodwork has been ordered to assess if his vitamin deficiencies and anemia have resolved, which should happen expeditiously. *Id.*

Having reviewed Mr. Bass's full medical records, and cognizant of his history of combat trauma and a seizure in October 2022, Dr. Davidoff recommends that Mr. Bass (1) be re-evaluated medically and neurologically to determine whether his prior subnormal B-12 and folate levels and anemia have resolved[,]" "to eliminate the possibility he has an untreated seizure disorder," and "to determine the need for a follow up CT angiogram"; (2) "receive ongoing evaluation and treatment for his schizophrenia, catatonic tendencies, and PTSD by clinicians who are experienced in the treatment of severe mental illness and head injury syndromes"; and (3) "receive adequate psychosocial support and education about his illnesses." *Id.* at 4. Dr. Davidoff writes: "**I do not believe that either the prison system or a nursing home can provide the psychiatric care that Mr. Bass requires**." *Id.* The prison system has neither the family support, the psychosocial stimulation, nor the specialized rehabilitation programs that Mr. Bass needs.

Dr. Davidoff underscores the importance of family support "in helping individuals with serious mental illness obtain the treatment they need." *Id.* Knowing about Mr. Bass's parents'

12

willingness to have Mr. Bass live with them and help him receive the medical and psychiatric care he needs through the VA, Dr. Davidoff recommends that the "most appropriate plan for Mr. Bass going forward might be for him to live at home and attend a partial hospital day program tailored to individuals with severe mental illness and head injury syndromes." *Id.* It is also possible that he will require a more structured in-patient environment, also tailored to those in his condition. *See* Ex. 2, Medical Records at 75 (recommendation by doctor at Robert Wood Johnson Hospital that Mr. Bass would need "prompts, "direction," and "similar intervention to take the medications prescribed to him upon discharge" and was "felt to need a structured environment with social stimulation to function adequately at this point") (Jan. 4, 2023 Clinical Encounter – Admin. Note).

      A prison, even a medical prison, is simply not the right place for an individual as sick as Mr. Bass. It is not staffed by "clinicians who are experienced in the treatment of individuals with severe mental illness and head injury syndromes," Dr. Davidoff Decl. at 4, as is the VA. *See, e.g.,* U.S. Dep't of Veterans Affairs, *Effects of TBI*, VA Mental Health (last accessed Feb. 19, 2023); *see id.* at *Schizophrenia*; *id.* at *PTSD*.[1] It does not have "program[s] tailored to individuals with severe mental illness and head injury syndromes," Dr. Davidoff Decl. at 5, like the VA does. *See id.* at *Polytrauma/TBI System of Care* (describing the VA's Polytrauma System of Care, an integrated network of specialized rehabilitation programs dedicated to serving Veterans and Service Members with both combat and civilian related Traumatic Brain Injury (TBI) and polytrauma); *id.* at *Evidence-Based Therapy* (describing evidence-based therapies for

---

[1] Available at https://www.mentalhealth.va.gov/tbi/; https://www.mentalhealth.va.gov/schizophrenia/index.asp; https://www.mentalhealth.va.gov/ptsd/index.asp.

schizophrenia, PTSD, & depression); *see also* U.S. Dep't of Veterans Affairs, *PTSD Treatment*, VA Health Care (last accessed Feb. 19, 2023) (describing variety of settings used for treatment of PTSD including outpatient and inpatient care).[2] A prison simply cannot provide Mr. Bass with the medical care, psychiatric care, and psychosocial support that he can receive with his family and through the VA, but he can only access those supports if this Court finds that Mr. Bass's severe psychological conditions are extraordinary and compelling reasons for his immediate release.

**C.     Mr. Bass Should Be Released Now and Quickly.**

Under § 3582(c)(1)(A), when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, as Mr. Bass does here, "the presumption then effectively shifts in favor of his release, and the court must determine whether any of the purposes of punishment set forth in section 3553(a) require keeping the defendant incarcerated nevertheless; that is, notwithstanding the extraordinary and compelling circumstances that would otherwise justify releasing him." *United States v. Greene*, 516 F. Supp. 3d 1, 27 (D.D.C. 2021) (KBJ).  Section 3553(a) imposes an "overarching duty" on courts to "impose a sentence sufficient, but not greater than necessary," *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean*, 137 S. Ct. at 1175.

---

[2] Available at https://www.polytrauma.va.gov/; https://www.va.gov/health-care/health-needs-conditions/mental-health/ptsd/; https://www.mentalhealth.va.gov/get-help/treatment/ebt.asp; https://www.research.va.gov/topics/tbi.cfm; https://www.research.va.gov/topics/ptsd.cfm.  Indeed, the VA does its own research into these illnesses because of their prevalence among veterans.  *see also* U.S. Dep't of Veterans Affairs, *VA Research on Traumatic Brain Injury (TBI)* & *VA Research on Posttraumatic Stress Disorder (PTSD)*, Office of Research & Development (last accessed Feb. 19, 2023)

After considering all of the circumstances in this case, the Court should conclude that none of the purposes of punishment are satisfied by keeping Mr. Bass imprisoned for six more painful months.

*First*, when this Court imposed its sentence, it did not know that Mr. Bass would be serving them under such intense and disorienting circumstances. It likely expected that just punishment would include calls, letters, or emails with loved ones; it has not. It likely expected that just punishment would include being oriented to time and place, knowing where it was that the punishment was taking place and how much longer it would last; it has not. It likely expected that just punishment would include the ability to eat, drink, groom oneself, and communicate wants and needs; it has not. In all these and myriad other ways, the imprisonment term that Mr. Bass has so far served has been far more punitive that this Court could have ever imagined.

*Second*, Mr. Bass is in no state to commit any crime. He is catatonic; he spends his time with his head covered, or staring at the wall, or sitting in the darkness. His continued imprisonment will serve no more of a deterrent effect than his release in the state that he is in.

*Third,* this Court already recommended that Mr. Bass serve his sentence at a residential reentry center should it facilitate his medical care, implicitly finding that the public would be adequately protected with Mr. Bass outside a formal prison setting. This is even truer now, when he is mute, withdrawn, and catatonic.

*Fourth*, Mr. Bass cannot rehabilitate inside prison walls in the state he is in. It is in fact unclear that he even knows he is inside a prison or why. Allowing him to be released to his loving and supportive family, who will work with the Veterans Administration to properly diagnose and treat his severe psychological disabilities, will promote his rehabilitation because he will access

15

the care he needs now. In six months' time, Mr. Bass will be released in the ordinary course, and all of the same concerns will need to be addressed then, except that he will have had six more months to decompensate.

*Fifth*, the purposes of punishment would be better served by Mr. Bass's release because it would "provide [him] with needed . . . medical care . . . in the most effective manner[.]" 18 U.S.C. § 3553(a)(2)(D). This is true for two primary reasons: first, the VA has all of Mr. Bass's medical records and a depth of experience treating combat veterans with head trauma resulting in PTSD, CTE, and seizure disorders, among other conditions. *See supra* at 13. Second, because of Mr. Bass's mental state, his parents' inability to communicate with him, and his continued incarceration outside this jurisdiction, they have been unable to have him sign a power of attorney or initiate the guardianship process. Without either, the VA will not fully engage with his parents as to his care—although those within the VA Mrs. Bass has contacted have done everything within their power absent those specific protocols to help, recognizing that Mr. Bass is in no place to help himself. Once Mr. Bass is home, his parents will be able to become integral parts of his care team, either through power of attorney or guardianship, depending on Mr. Bass's competency level.

None of the purposes of punishment would be satisfied should Mr. Bass remain inside prison walls for six more months, catatonic, unresponsive, withdrawn, and unable to care for his daily needs.

D.  **Release Plan**

Mr. Bass is in crisis, and needs to come home and access specialized care. Recognizing, however, that he has six months remaining on his sentence and that this Court recommended a

16

residential reentry center as one location at which he could serve his sentence, this Court may wish to impose, as a condition of supervised release, six months of home confinement. *See, e.g., United States v. Carter*, No. 16-cr-156-TSC, ECF No. 48 (D.D.C. June 10, 2020) (6 months of home confinement); *United States v. Dunlap*, No. 17-cr-207-KBJ, 485 F. Supp. 3d 129 (D.D.C. Sept. 2, 2020) (same); *United States v. Geno Jenkins*, No. 01-cr-00311 (TFH), ECF No. 113 (D.D.C. Dec. 4, 2020) (same). Mr. Bass would only ask that he not bear the costs and that he be authorized to attend all medical and mental health appointments that are necessary for his continued care.

Mr. Bass's family is fully aware that the instant offense occurred at the VA medical center in Washington, D.C., and that this Court may have concerns about Mr. Bass returning to that same center. There is a VA medical center in Baltimore that Mr. Bass's family intends to use for his treatment and care. *See* U.S. Dep't of Veterans Affairs, *VA Maryland health care; Locations; Baltimore VA Medical Center* (listing services as including mental health care, neurology, and PTSD care) (last accessed Feb. 19, 2023).[3]

In light of Mr. Bass's condition, the BOP and U.S. Marshals Service will likely require time to make arrangements to return him to his parents' home. Therefore, to ensure his safe transport, Mr. Bass respectfully requests that the Court reduce his sentence to time served, but give the government a brief amount of time to make travel arrangements. Other courts in this district have provided the government with similarly brief amounts of time to coordinate travel and care in similar cases. *See United States v. Gary West,* No. 01-cr-168 (PLF), ECF No. 409;

---

[3] Available at https://www.va.gov/maryland-health-care/locations/baltimore-va-medical-center/.

*United States v. Carlos Curtis*, No. 03-cr-533 (BAH), ECF Nos. 241, 242.  Mr. Bass requests that this Court do the same.

V.   **Conclusion**

When this Court sentenced Mr. Bass, it did not know that his psychological health would plunge so quickly.  Mr. Bass now requires more supportive surroundings and specialized care than the BOP can provide.  He therefore respectfully requests that this Court order his immediate release.

    Respectfully submitted,

    A. J. KRAMER
    FEDERAL PUBLIC DEFENDER

    _____/s/_____
    Joanna Munson Perales
    Research & Writing Attorney
    625 Indiana Ave. NW, Ste. 550
    Washington, D.C. 20004
    (202) 208-7500